FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

       *Plaintiff - Appellee*,

  v.

MARK RIDLEY-THOMAS,

       *Defendant - Appellant*.

No. 23-2200

D.C. No.
2:21-cr-00485-
DSF-1
Central District of
California,
Los Angeles

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted November 21, 2024
Pasadena, California

Filed August 3, 2026

Before:  Johnnie B. Rawlinson, Morgan B. Christen, and
Anthony D. Johnstone, Circuit Judges.

## SUMMARY[*]

### Criminal Law

The panel affirmed Mark Ridley-Thomas's convictions for one count of conspiracy in violation of 18 U.S.C. § 371, one count of bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B), and five counts of honest services mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1346, and 2(b).

Ridley-Thomas is a former Supervisor on the Los Angeles County Board of Supervisors. The convictions were based on a scheme in which Marilyn Flynn, the then-Dean of the School of Social Work at the University of Southern California (USC), facilitated a $100,000 donation of university funds to the nonprofit that employed Ridley-Thomas's son Sebastian in exchange for Ridley-Thomas voting in favor of a "telehealth contract" between the County and USC.

The panel held that the district court did not err in denying Ridley-Thomas's motion for judgment of acquittal for his honest service fraud convictions. The service of funneling $100,000 from Ridley-Thomas to USC to United Ways for Sebastian's benefit was a "thing of value" sufficient to support the § 1346 convictions. Ridley-Thomas's argument that "perceived reputational benefit" cannot be a "thing of value" misstates the Government's theory. Section 1346 contains neither a requirement that a public official derive some type of "personal enrichment" nor a requirement that each participant in the scheme

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

personally benefit. The Government was not required to present direct evidence of Ridley-Thomas's constituents' approval or disapproval of his actions to support a conviction for honest services fraud, and the evidence presented at trial was sufficient evidence to support a finding of materiality.

The panel held that the district court did not err in denying Ridley-Thomas's motion for judgment of acquittal for his bribery conviction. The funneling scheme was a "thing of value" sufficient to support a violation of § 666(a)(1)(B), and sufficient evidence supports a finding that the transaction involved "anything of value of $5,000 or more."

The panel concluded that the district court committed no error instructional error, rejecting Ridley-Scott's contentions concerning intent to deceive, conflation of gratuities and bribery, quid pro quo, and "lawful ingratiation."

Because the honest services fraud and federal bribery convictions were predicated on legally valid objects, the panel affirmed the related conspiracy conviction.

Ridley-Thomas contended that a combination of race and gender improperly animated the Government's use of peremptory strikes on the only two Black female prospective jurors. The panel declined to extend *Batson v. Kentucky*, 476 U.S. 79 (1986), to intersectional considerations, and concluded that the district court did not clearly err in rejecting Ridley-Thomas's challenges to the strikes.

## COUNSEL

Lindsey G. Dotson (argued), Thomas F. Rybarczyk, Michael J. Morse, and Elana S. Artson, Assistant United States Attorneys; Bram M. Alden and Mack E. Jenkins, Assistant United States Attorneys, Chiefs, Criminal Appeals Section; E. Martin Estrada, United States Attorney; Office of the United States Attorney, United States Department of Justice, Los Angeles, California; for Plaintiff-Appellee.

Alyssa D. Bell (argued), Michael V. Schafler, and Neil S. Jahss, Cohen Williams LLP, Los Angeles, California; Daralyn J. Durie and Galia Amram, Morrison & Foerster LLP, San Francisco, California; Paul J. Watford, Wilson Sonsini Goodrich & Rosati, Los Angeles, California; Erwin Chemerinsky, University of California Berkeley School of Law, Berkeley, California; for Defendant-Appellant.

Nadia A. Sarkis, Mira Hashmall, and Louis R. Miller, Miller Barondess LLP, Los Angeles, California, for Amici Curiae Former California Officials.

Houston Goddard, Goddard Pope PLLC, Nashville, Tennessee; Miles Pope, Goddard Pope PLLC, Boise, Idaho; Margaret A. Farrand, Deputy Federal Public Defender; Cuauhtémoc Ortega, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Amici Curiae Ninth Circuit Federal Public and Community Defenders.

S. Stan Chiueh, Elizabeth Bierut, Dania Bardavid, and Caroline McHugh, Friedman Kaplan Seiler Adelman & Robbins LLP, New York, New York; Robert S. Chang, Fred T. Korematsu Center for Law and Equality, Seattle University School of Law, Seattle, Washington; for Amici

Curiae Black Law Professors and Historians and Justice Centers.

---

**PER CURIAM**

PER CURIAM:

Mark Ridley-Thomas (Ridley-Thomas), a former Supervisor on the Los Angeles County Board of Supervisors (Board of Supervisors), appeals his convictions for one count of conspiracy in violation of 18 U.S.C. § 371, one count of bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B), and five counts of honest services mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1346, and 2(b). The convictions stemmed from charges related to a *quid pro quo* scheme between Ridley-Thomas and Marilyn Flynn (Flynn), the then-Dean of the School of Social Work at the University of Southern California (USC), for the benefit of Ridley-Thomas's son Sebastian. Of the Government's honest services fraud and bribery *quid pro quo* theories, the jury rejected all but one: that Flynn facilitated a $100,000 donation of university funds to the nonprofit that employed Sebastian in exchange for Ridley-Thomas voting in favor of a "telehealth contract" between the County and USC. For the reasons discussed below, we affirm the convictions.

## I. BACKGROUND

Ridley-Thomas served on the Board of Supervisors from 2008 to 2020. The five-member Board of Supervisors performs executive, legislative, and quasi-judicial duties for Los Angeles County, and controls the County's $30+ billion

budget. Ridley-Thomas served as chair of the Board of Supervisors from December 2012 through December 2013, and December 2016 through December 2017. During this time, he supported several contracts by which USC's School of Social Work provided services for County constituents.

Ridley-Thomas's son Sebastian served as a member of the California State Assembly from 2013 to 2017. When Sebastian resigned from the Assembly, he was the subject of two non-public sexual harassment complaints for conduct that allegedly occurred in 2016 and 2017.

The Government's evidence at trial showed that Ridley-Thomas helped Sebastian arrange educational and professional opportunities in the months leading up to and following his resignation from the Assembly. Ridley-Thomas turned to Flynn to create a landing spot for Sebastian. At the time, Flynn was looking to correct a multimillion-dollar budget deficit at USC's School of Social Work by securing lucrative County contracts, which she saw as the school's fiscal lifeline.

In May 2017, Ridley-Thomas emailed Flynn, requesting to speak on the phone. Two days later, Sebastian emailed Flynn about setting up a meeting, and the following week, Ridley-Thomas emailed Flynn, "We're overdue for a lunch. Lots to catch up on." An article about Sebastian was linked to the email.

Emails that Flynn exchanged with her colleagues at USC and with Sebastian show that Sebastian was anxious to pursue graduate-level studies at USC's School of Social Work and School of Public Policy. And USC became interested in admitting him. The University did not offer the program Sebastian was interested in pursuing, but Flynn represented that she would coordinate with Jack Knott, Dean

of the USC School of Public Policy, to develop a joint degree program for him.  On May 26, 2017, Flynn emailed Sebastian updating him on her efforts to secure his admission to a joint master's degree program with a full-tuition scholarship, and on June 5, 2017, Flynn emailed Mark Todd, an employee in the USC Provost's office, about a joint degree offer to Sebastian.  Her email stated, "[w]e will offer a full scholarship between the two schools."  Flynn noted that the agreement was for a "full scholarship for our funds."

Ridley-Thomas and Flynn stayed in close contact during the ensuing months.  On June 23, 2017, Ridley-Thomas met with Flynn in her office at USC.  During that meeting, they discussed various USC programs that involved existing and anticipated contracts between USC's School of Social Work and the County.  Flynn memorialized the topics discussed during this meeting in a letter addressed to Ridley-Thomas dated July 23, 2017, which Flynn directed a subordinate to hand-deliver directly to Ridley-Thomas's office.  The letter referred to three proposals for expanding USC's work with the County, two of which Flynn described as "blocked" or "stalled."

The first was a partnership between USC and the "Vermont Street Reentry Center," a facility run by the County, with USC providing social work services.  The second was a proposed training center for the County Probation Department, "Probation University," with USC providing training for the Probation Department employees. The third was for a renewed, expanded contract from the County for the provision of "telehealth" mental health counseling services (Telehealth) to a broader spectrum of clients, referred by the County, including veterans.  USC's existing Telehealth program had called for the provision of

services in return for County funding, but the program was operating at a deficit, with USC losing approximately $1 million per year. Flynn planned to increase the financial viability of the Telehealth program by expanding the number of clients the program could serve. The expansion would require an amended contract, subject to approval by the Board of Supervisors.

Ridley-Thomas began promoting these matters before the Board of Supervisors in mid-2017. First was the Vermont Street Reentry Center. On July 30, 2017, after seeing that the Board of Supervisors was considering an agenda item involving the Vermont Street Reentry Center, Flynn emailed a colleague that "I talked with [Ridley-Thomas] about this, and I am very happy to see that he was as good as his word." A little over a week after receiving the hand-delivered letter from Flynn, Ridley-Thomas co-sponsored and voted in favor of an agenda item before the Board of Supervisors involving the Vermont Street Reentry Center.

Next was Probation University. On October 12, 2017, after seeing an agenda item involving the "Probation University" program pending before the Board of Supervisors and co-sponsored by Ridley-Thomas, Flynn emailed a colleague "I am holding my breath . . . [Ridley-Thomas] is really trying to deliver here."

Around the same time, in October 2017, Sebastian spoke with Dean Knott and expressed an interest in teaching a class at USC's Public Policy School while simultaneously pursuing a master's degree.

By letter dated November 28, 2017, Sebastian was formally notified that the California State Assembly had launched an investigation based on a "complaint concerning

[Sebastian's] alleged conduct." The same letter informed Sebastian that an independent attorney investigator would schedule a meeting with him, and that the Assembly Rules Committee would determine next steps after the conclusion of the investigation. One week later, on December 5, 2017, Sebastian emailed Dean Knott stating that "Practitioner-In-Residence" was a preferable title for his professorship, and emails that Flynn exchanged with colleagues at USC confirmed Sebastian and Flynn contemplated a salary of $25,000 from the School of Social Work and a matching amount from the School of Public Policy. Ridley-Thomas was copied on Sebastian's email to Knott at the School of Public Policy. Knott responded on December 9 that, until his meeting with Sebastian that week, he understood that Sebastian would be working as a full-time member of the state legislature, giving guest lectures or meeting with students on a voluntary basis, for which the School of Public Policy sometimes paid an honorarium. Dean Knott informed Sebastian that it would not be possible to arrange an employment contract before the holidays to accommodate a January start date. Sebastian forwarded this email to Ridley-Thomas that same day.

On December 14, 2017, Flynn sent an email flagged as "HIGHLY IMPORTANT – VAC enrollment of Sebastian Ridley-Thomas." The message asked colleagues at the School of Social Work to expedite the admissions process for Sebastian. Subsequent emails confirm a plan to grant a full scholarship for Sebastian, as well as the Dean's Leadership Award, despite his failure to complete his application or provide undergraduate transcripts.

Also on December 14, 2017, Ridley-Thomas twice called John Sherin, director of the Los Angeles County Department of Mental Health (DMH), whose support was

needed to advance the Telehealth amendment before the Board of Supervisors. Ridley-Thomas emailed Flynn later that day with the subject line "John Sherin," stating that "He's ready to go."

Within an hour of receiving Ridley-Thomas's email about Sherin, Flynn emailed several of her colleagues about Sebastian's enrollment in the joint degree master's program and his full-tuition scholarship, requesting that his application be given "highest priority." The next day, Flynn emailed Dean Knott at the School of Public Policy, and stated, "in the interests of showing [Ridley-Thomas] that we can deliver, it would be provident to get [Sebastian's] offer letter out before the holidays." But by email dated December 16, 2017, Flynn notified Sebastian that it would not be possible to deliver an offer letter before winter break.

With Sebastian's resignation from the Assembly imminent, Ridley-Thomas inquired about a position for Sebastian with the African American Civic Engagement Project (AACEP), a non-profit organization affiliated with Community Partners. AACEP's financial position was poor at that time, and on December 7, 2017, Ridley-Thomas donated $100,000 from his campaign committee to the organization. The President and CEO of Community Partners, Paul Vandeventer, expressed general support for Sebastian's qualifications, but concern about the use of "campaign funds" to "hire [Ridley-Thomas's] son," nepotism, and being "seen as doing special favors for special people." On December 26, 2017, Sebastian resigned from the California State Assembly, citing deteriorating health. On January 9, 2018, USC offered Sebastian a full tuition scholarship to its School of Social Work.

By the end of January 2018, Community Partners had returned the $100,000 payment to Ridley-Thomas and Sebastian started his own nonprofit, the Policy, Research & Practice Initiative (PRPI). PRPI needed a fiscal sponsor, and Ridley-Thomas contacted Peter Manzo, President and CEO of California United Ways (United Ways). A fiscal sponsorship agreement between United Ways and PRPI was approved on March 9, 2018, and signed by Sebastian. Sebastian prepared and submitted a budget to United Ways that proposed a $75,000 salary for himself and $67,200 for an associate director. Sebastian shared these draft budgets with his father. It was incumbent on PRPI to raise the necessary funds to support the proposed budget.

On February 16, 2018, USC offered Sebastian a faculty appointment at the School of Public Policy. On February 23, Flynn emailed Ridley-Thomas about the Telehealth contract amendment that was on the Board of Supervisors' agenda for the following week. Flynn's email outlined several of her desired amendments to the contract. Ridley-Thomas responded to Flynn's email with "Your wish is my command." Though Sebastian had no connection to the Telehealth amendment, Ridley-Thomas copied him on this email.

By the beginning of April 2018, the Telehealth amendment was not yet approved by the Board of Supervisors, and emails between Flynn and her colleagues on April 1 revealed that Flynn was of the view that the School of Social Work was approaching a critical point in attempting to get the Telehealth amendment approved. Flynn wrote that a better strategy was needed "for ensuring that we don't lose this very important opportunity." On April 20, 2018, Ridley-Thomas contacted Flynn by phone, and a series

of phone calls ensued among Ridley-Thomas, Flynn, and John Sherin between April 22 and April 23.

On April 26, Ridley-Thomas and Flynn met in person. Flynn's USC lobbying activity report listed a meeting with Ridley-Thomas "to discuss a gift agreement." Shortly after that meeting, Flynn told USC Executive Vice Dean John Clapp that "we're going to get the Telehealth contract," adding that she "had to do a little favor to get it."

Ridley-Thomas donated $100,000 from his Committee for a Better L.A. to the USC School of Social Work on May 2, 2018. A letter accompanying the donation stated, "these funds can be used at your discretion in order to best facilitate the impressive policy and practical work of the School and its impact in the community." USC formally thanked Ridley-Thomas for the donation and deposited the check. Despite his statement that the funds were to be used at USC's discretion, Ridley-Thomas sent an email to Flynn the day after he made the donation stating: "[a]t this point it is necessary to act with dispatch" to facilitate the hiring of PRPI's assistant director, which should happen "in a timely manner—no later than May 15th." Sebastian was copied on this email to Flynn.

Flynn acted swiftly to meet Ridley-Thomas's requested May 15 deadline. Within about fifteen minutes, she sent a message to a program administrator, flagged as "URGENT." It read, "I will explain later, but it is urgent that we issue a sponsorship to United Way of California for $100,000 and that it be received by May 15 if at all possible." The administrator relayed that there were not sufficient funds in the account over which she had control, and the funds would have to come from an account at the "main office." Flynn began communicating with others within the administration

to facilitate the transfer. In doing so, she made several misrepresentations to colleagues at USC regarding the forthcoming $100,000 payment from USC to United Ways for PRPI. For instance, she represented that United Ways was a vendor providing services to USC. She also represented that United Ways intended to use the $100,000 payment for a survey, and concealed that the money would be used in part to pay a third party's salary. The use of university funds to pay a third party's salary directly violated USC policy. In the end, one week after USC received the $100,000 payment from Ridley-Thomas, USC issued a $100,000 check to United Ways.

On July 31, 2018, Ridley-Thomas voted in favor of the amended Telehealth contract, which included every expanded provision Flynn had requested. After a whistleblower raised concerns about the $100,000 payment to United Ways, USC opened an internal investigation that resulted in USC returning Ridley-Thomas's $100,000 donation. USC also terminated Sebastian's professorship and scholarship, and made criminal referrals to the United States Attorney and to the Federal Bureau of Investigation.

Ridley-Thomas and Flynn were subsequently charged with one count of conspiracy in violation of 18 U.S.C. § 371. Ridley-Thomas was also charged with one count of bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B), and Flynn was charged with one count of bribery in violation of 18 U.S.C. § 666(a)(2). Both Ridley-Thomas and Flynn were charged with seventeen counts of honest services mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1346, and 2(b). The indictment alleged that Ridley-Thomas engaged in a *quid pro quo* bribery scheme with Flynn. The Government charged Ridley-Thomas with seeking four benefits from Flynn and

USC for Sebastian: (1) admission to a USC master's degree program; (2) a full-tuition scholarship for the master's program; (3) a paid professorship at USC; and (4) Flynn's assistance in funneling a $100,000 payment from USC to a fiscal sponsor to benefit a nonprofit organization and Sebastian. In return, Ridley-Thomas agreed to vote in favor of and influence others to act in favor of County contracts that benefitted USC.

Following a sixteen-day trial the jury convicted Ridley-Thomas of one count each of conspiracy, federal program bribery, and honest services mail fraud, and four counts of honest services wire fraud. These convictions were based on Flynn's assistance in funneling the $100,000 payment from Ridley-Thomas's campaign fund to PRPI. The jury acquitted Ridley-Thomas on the remaining honest services fraud counts based on Sebastian's admission, scholarship, or professorship at USC. Ridley-Thomas filed a timely appeal.[1]

## II. STANDARDS OF REVIEW

"We review de novo whether the Government's theory of fraud at trial was legally valid." *United States v. Milheiser*, 98 F.4th 935, 941 (9th Cir. 2024) (citation omitted). "We review the formulation of jury instructions for abuse of discretion, but review de novo whether those instructions correctly state the elements of the offense and adequately cover the defendant's theory of the case. . . ." *United States v. Koziol*, 993 F.3d 1160, 1179 (9th Cir. 2021) (citation and internal quotation marks omitted). "[W]e review the district court's ruling on a *Batson* challenge for

---

[1] Flynn entered a guilty plea. She was sentenced to three years' probation and ordered to pay a fine in the amount of $150,000.

clear error. . . ."  *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1163 (9th Cir. 2022), *as amended* (citation omitted).

## III.  DISCUSSION

Ridley-Thomas challenges the Government's theory of honest services fraud under 18 U.S.C. § 1346 and federal programs bribery under 18 U.S.C. § 666(a)(1)(B).  He argues that the Government relied on a legally invalid "thing of value" as an element of both honest services fraud and bribery.  According to Ridley-Thomas, § 1346 criminalizes only traditional bribery and kickback schemes, and the "secret funneling" scheme on which the Government relied as one of the *quids*—the transfer of $100,000 from Ridley-Thomas's ballot committee through USC to United Ways and PRPI for Sebastian's benefit—does not fit within this traditional paradigm of criminal bribery schemes.  Ridley-Thomas also contends that this funneling scheme cannot constitute a "thing of value" under § 666(a)(1)(B).  We disagree.

### A.  Honest Services Fraud

The honest services fraud statute criminalizes any "scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  As interpreted by this Court, "[u]nder 18 U.S.C. § 1346, an official is guilty of honest-services fraud if he accepts something of value in exchange for an official act."  *United States v. Renzi*, 769 F.3d 731, 744 (9th Cir. 2014) (citations omitted).  Thus, "[s]ection 1346 honest services convictions on a bribery theory . . . require at least an implied *quid pro quo*."  *United States v. Garrido*, 713 F.3d 985, 997 (9th Cir. 2013) (citation and footnote reference omitted).

In *Skilling v. United States*, 561 U.S. 358, 368 (2010), the United States Supreme Court limited § 1346 to encompass only "bribery and kickback schemes," as developed in the "core" cases decided "pre-*McNally* [*v. United States*, 483 U.S. 350 (1987)]," which the Supreme Court described as "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Id.* at 404. The Supreme Court expounded that the honest services fraud statute "draws content not only from the pre-*McNally* case law, but also from federal statutes proscribing—and defining—similar crimes," including 18 U.S.C. §§ 201(b) (bribery of a public official), 666(a)(2) (federal programs bribery), and 41 U.S.C. § 52(2) (defining "kickback"). *Id.* at 412.

Jurors were instructed that to convict Ridley-Thomas of honest services mail fraud, the Government was required to prove that he "devised or knowingly participated in a scheme or plan to deprive the residents of the County of Los Angeles of their right of honest services;" and that "[t]he scheme or plan consisted of a bribe in exchange for at least one official act by [Ridley-Thomas]."

Ridley-Thomas contends that this theory of honest services fraud was legally invalid because perceived reputational benefits cannot constitute a "thing of value" under *Skilling*. Additionally, he asserts that the Government failed to prove that he engaged in deception that was material to the residents of Los Angeles County. We consider each of these challenges in turn.

### 1. Thing of Value

When, as here, an honest services fraud conviction is based on bribery, we often look to 18 U.S.C. § 201(b) for

guidance.  *See*, *e.g.*, *United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167, 1176–77 (9th Cir. 2024).  Section 201(b)(2) provides for punishment of a public official who "directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for: (A) being influenced in the performance of any official act. . . ." 18 U.S.C. § 201(b)(2).

In *Renzi*, we noted that the phrase "thing of value is defined broadly to include the value which the defendant subjectively attaches to the items received."  *See* 769 F.3d at 744 (citation and internal quotation marks omitted).  There, a United States Congressman was convicted of honest services fraud for accepting a $200,000 early repayment of a large private debt in exchange for using his influence to move a bill through Congress.  *See id.*  We reasoned that the payment had subjective value to Renzi "because it was a $200,000 payment," and "because it was the early repayment of a large private debt."  *Id.*  In affirming Renzi's conviction, we concluded that repayment of the debt "clouded [Renzi's] judgment in performing his official duties and deprived his constituents of the honest services of their elected representative."  *Id.*

Although admittedly not the usual bribery scheme involving the transfer of money *to* a public official, the transfer of $100,000 from Ridley-Thomas to USC to United Ways for Sebastian's benefit constitutes a "thing of value" under our precedent.   The Government's evidence established that Ridley-Thomas subjectively valued the ability to transfer $100,000 from his campaign fund to United Ways, specifically to a program that would benefit Sebastian by providing him with employment after he resigned from the legislature.   The evidence showed that

Ridley-Thomas was aware of the ethics inquiry that coincided with Sebastian's resignation, and that he valued the ability to indirectly transfer funds for Sebastian's benefit, swiftly, while concealing the source of the funds. Ridley-Thomas argues strenuously that he broke no campaign finance laws by making this payment, and that because he could have made the donation directly, the funneling service provided by USC cannot constitute a "thing of value." But this argument overlooks the Government's evidence showing that Ridley-Thomas attempted to send a payment directly from his campaign fund to another non-profit where Sebastian hoped to be employed, and the funds were returned because the non-profit director was concerned about "nepotism and being seen as doing special favors for special people." Thus, contrary to Ridley-Thomas's contention that he could have made the payment directly himself, the Government's evidence showed that Ridley-Thomas needed a third-party intermediary to effectuate the transfer. Flynn supplied that service.

Ridley-Thomas contends that the Government's theory of bribery was predicated on his desire to avoid the nepotistic optics that had hampered his previous attempt to provide $100,000 to AACEP through Community Partners. Ridley-Thomas maintains that "perceived reputational benefit" cannot be a "thing of value" under *Skilling* because no pre-*McNally* bribery or kickback case has recognized a similar "thing of value." This argument misstates the Government's theory regarding the alleged "thing of value." The Government explicitly alleged in the indictment that the transfer of $100,000 was one of the *quids* in the *quid pro quo* scheme between Ridley-Thomas and Flynn, and it maintained this argument throughout trial. The district court instructed the jury that "a thing of value does not have to be

tangible," and that the Government alleged the "thing of value" to include one or more of: Sebastian's admission, scholarship, professorship, or "[a] $100,000 payment from USC to the United Ways of California." The Government's consistent argument of a *quid pro quo* bribery scheme fits within *Skilling*'s articulation of honest services fraud cases that are consistent with the pre-*McNally* core of bribery and kickback schemes. *See Skilling*, 561 U.S. at 368; *see also Renzi*, 769 F.3d at 744.

Ridley-Thomas insists that a public official must derive some type of "personal enrichment" to commit honest services fraud. But § 1346 contains no such requirement, and we have held that "private gain is not an element of honest services fraud." *United States v. Inzunza*, 638 F.3d 1006, 1018 (9th Cir. 2011), *as amended*; *see also United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005) (concluding that "[a] participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants").

Nor is there a requirement that each participant in the scheme personally benefit. Although the benefit of the $100,000 transfer accrued most directly to Sebastian, this benefit is a sufficient "thing of value" to support a conviction for honest services fraud. *See* 18 U.S.C. § 666(a)(1)(B) (proscribing the corrupt solicitation or demanding by a public official "for the benefit *of any person*") (emphasis added). Ridley-Thomas's request for Flynn's assistance occurred while the Telehealth amendment hung in the balance, awaiting approval from the Board of Supervisors. Flynn's assistance with the $100,000 cash transfer through USC for Sebastian's benefit was an impermissible string attached to Ridley-Thomas's support of the Telehealth amendment. As in *Renzi*, this arrangement "clouded

[Ridley-Thomas's] judgment in performing his official duties and deprived [Los Angeles County residents] of the honest services of their elected representative." 769 F.3d at 744.

### 2. Materiality of the Deception

Ridley-Thomas contends that the Government failed to present sufficient evidence of materiality. Stated differently, Ridley-Thomas emphasizes the lack of evidence that his "constituents would have wanted or expected him to disclose the source of the donation to PRPI or Flynn's role in facilitating it." We reject this argument.

In reviewing sufficiency of the evidence, "we view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Grovo*, 826 F.3d 1207, 1213-14 (9th Cir. 2016) (citation omitted).

"[A] breach of a fiduciary duty is an element of honest services fraud" under 18 U.S.C. § 1346. *United States v. Milovanic*, 678 F.3d 713, 722 (9th Cir. 2012), *as amended* (en banc) (citation omitted). To commit a breach of fiduciary duty sufficient for an honest services fraud conviction, the proven dishonesty must be material, naturally tending to lead or capable of leading a reasonable decisionmaker subjected to the dishonesty to "change its conduct." *Id.* at 727 (citation omitted). At a minimum, a rational trier of fact could have determined that had the other County Supervisors been aware of the scheme, one or more of them would have changed their vote (conduct) on the Telehealth amendment. *See id.; see also Percoco v. United States*, 598 U.S. 319, 329-30 (2023) (explaining that a government agent owes a fiduciary duty to the "government"

as well as to "the public."); *Garrido*, 713 F.3d at 992 (noting that "a public official acts as trustee for the citizens and the State and thus owes the normal fiduciary duties of a trustee, *e.g.*, honesty and loyalty to them.") (citation and alterations omitted). The Government was not required to present direct evidence of Ridley-Thomas's constituents' approval or disapproval of his actions. *See Milovanovic*, 678 F.3d at 727. Rather, the Government was only required to establish "honest services fraud committed against the public." *Id.* Viewed in the light most favorable to the Government, a "rational trier of fact could have found the essential elements of [honest services fraud] beyond a reasonable doubt." *Grovo*, 826 F.3d at 1213-14 (citation omitted). Thus, the evidence presented at trial was sufficient to support a finding of materiality. *See id.*

The district court did not err in denying Ridley-Thomas's motion for judgment of acquittal for his honest services fraud conviction.

## B. Federal Program Bribery

As with the honest services fraud convictions, Ridley-Thomas contends that the acceptance of perceived reputational benefits is not a "thing of value" under 18 U.S.C. § 666(a)(1)(B).

Section 666 provides for punishment of:

> Whoever . . . being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof . . . corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection

with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more.

18 U.S.C. § 666(a)(1)(B).

Ridley-Thomas asserts that under *Skilling*, the phrase "thing of value" should be construed the same in § 1346 and in § 666. The Supreme Court has noted the similarities between federal programs bribery under § 666(a) and similar criminal statutes. *See Skilling*, 561 U.S. at 412-13. As mentioned, *Skilling* recognized that the honest services fraud statute "draws content . . . from federal statutes proscribing—and defining—similar crimes," such as 18 U.S.C. §§ 666(a)(2) and 201(b). *Id.* at 412. And, as discussed, we have held that "thing of value" in § 1346 includes the objective value and "the value which the defendant subjectively attaches to the items received." *Renzi*, 769 F.3d at 744 (citation omitted). Similarly, the Supreme Court has held that "anything of value" under § 666 includes "all transfers of personal property *or* other valuable consideration in exchange for the influence or reward." *Salinas v. United States*, 522 U.S. 52, 57 (1997) (emphasis added). The transfer, therefore, of $100,000 from Ridley-Thomas's ballot committee through USC to United Ways for the benefit of Sebastian's nonprofit constitutes an "anything of value" sufficient to support Ridley-Thomas's conviction for violating § 666(a)(1)(B). *See, e.g., United States v. Turchin*, 21 F.4th 1192, 1203 (9th Cir. 2022) (holding that cash was a "thing of value" under § 666); *United States v. Townsend*, 630 F.3d 1003, 1011 (11th Cir. 2011) (recognizing that "intangibles . . . are things of value" and

collecting cases from the Third, Fifth, Seventh, and Eighth Circuits holding the same).

Sufficient evidence also supports a finding that the transaction involved "anything of value of $5,000 or more." At trial, the Government provided evidence that the Telehealth amendment exceeded $5,000 because the amendment maintained funding for the contract at $530,323. The Government's evidence that the value of the Telehealth amendment is more than $5,000 was sufficient for the jury to conclude that the bribe related to a transaction of more than $5,000. Thus, the district court did not err in denying Ridley-Thomas's motion for judgment of acquittal for his bribery conviction.

## C. Jury Instruction Challenges

Ridley-Thomas asserts four challenges to the jury instructions. First, he contends that although honest services fraud requires the intent to both deceive *and* cheat, the district court instructed only on the intent to cheat. Next, he argues that the instructions for both honest services fraud and federal program bribery allowed the Government to improperly present a "monetization" theory that conflated gratuities and bribes. Third, he maintains that the district court failed to instruct the jury that federal program bribery requires proof of a *quid pro quo*. Finally, he asserts that the instructions failed to distinguish bribery from lawful ingratiation.

"A defendant is not entitled to any particular form of instruction, nor is he entitled to an instruction that merely duplicates what the jury has already been told." *Shen Zhen*, 115 F.4th at 1180 (citation omitted). "[We] are required to review the jury instructions as a whole . . ." *United States v. Kincaid-Chauncey*, 556 F.3d 923, 946 (9th Cir. 2009)

(citation omitted), *abrogated on other grounds by Skilling*, 561 U.S. at 409-10. We consider each challenge in turn.

### 1. Intent Instruction For Honest Services Fraud

The district court instructed the jury that honest services fraud requires the Government to prove that:

> 1. Defendant devised or knowingly participated in a scheme or plan to deprive the residents of the County of Los Angeles of their right of honest services;
>
> 2. The scheme or plan consisted of a bribe in exchange for at least one official act by defendant, with all of you agreeing as to which act. . . .
>
> 4. Defendant acted with the intent to defraud by depriving the residents of the County of their right of honest services.

Ridley-Thomas argues that the instruction on honest services fraud required the jury to find an intent to "cheat" the residents of the County out of his honest services, but omitted the requirement that the jury find an intent to "deceive" his constituents in doing so.

In the context of traditional wire fraud, the jury must be instructed on defendant's intent "to deceive *and* cheat," rather than an intent "to deceive *or* cheat." *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020) (emphases in the original). That is to say, a jury must find the defendant's intent "to deprive the victim of money or property by means of deception." *Id.* at 1103. Here, the district court used the Ninth's Circuit model instruction. *See* Ninth Circuit Model Criminal Jury Instructions 15.34 (2022). The instruction

incorporated the element of deceptive intent by requiring the jury to find that Ridley-Thomas "acted with the intent to defraud," which constitutes a "reference[] to the specific intent to defraud the public." *Kincaid-Chauncey*, 556 F.3d at 945-46. Because the word "defraud" was included in the instruction, to convict Ridley-Thomas of honest services fraud, the jury was required to find that Ridley-Thomas had the requisite intent to deceive the residents of the County. *See Defraud*, *Black's Law Dictionary* (12th ed. 2024) ("To cause injury or loss to (a person or organization) by deceit; to trick (a person or organization)"). The jury heard considerable evidence regarding the lengths Ridley-Thomas went to in order to conceal that $100,000 of his campaign funds were used to provide employment for Sebastian, and that the funneling of this payment was accomplished with Flynn's assistance at a time when County contracts with USC worth millions of dollars hung in the balance.

Accordingly, the district court did not abuse its discretion in rejecting Ridley-Thomas's proposed honest services fraud instruction. *See Kincaid-Chauncey*, 556 F.3d at 946; *see also Shen Zhen*, 115 F.4th at 1180 ("A defendant is not entitled . . . to an instruction that merely duplicates what the jury has already been told") (citation omitted).

## 2. Gratuities Instruction

Ridley-Thomas maintains that the failure to instruct the jury that a gratuity is not a bribe permitted the jury to convict him of honest services fraud and federal program bribery under a legally invalid "monetization" theory that improperly conflated gratuities and bribes. We are not persuaded. The district court instructed the jury that it must find that the "scheme or plan consisted of a bribe in exchange for at least one official act by defendant." This instruction

directed the jury to find *quid pro quo* bribery as an element of honest services fraud. *See Shen Zhen*, 115 F.4th at 1176 (explaining that "[w]hen based on bribery, conviction for honest-services fraud requires proof of the bribe-giver's intent to enter a quid pro quo"). So the jury was required to find that Ridley-Thomas engaged in a bribery scheme before convicting him of honest services fraud. Notably, no credible evidence was presented that the transfer of funds was intended as a gratuity. Rather, the undisputed evidence was that the $100,000 was transferred for Sebastian's benefit and that Ridley-Thomas reached out to make the arrangements for Sebastian well before he cast his votes. On this record, the district court did not abuse its discretion in rejecting Ridley-Thomas's proposed gratuity instruction. *See id.*

### 3. Quid Pro Quo Instruction for Federal Programs Bribery (§ 666(a))

Ridley-Thomas challenges the district court's denial of his request for a jury instruction that the Government was required to prove a *quid pro quo* to obtain a conviction for federal program bribery in violation of § 666(a). During this appeal, the Supreme Court held in *Snyder v. United States*, 603 U.S. 1 (2024), that § 666 "is a bribery statute and not a gratuities statute," such that "payments made to an official *after* an official act as a token of appreciation" are not covered by the statute. *Id.* at 5, 10 (emphasis in the original). And a bribe requires "a *quid pro quo*." *United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 404 (1999).

The district court's instruction included the essential elements of a *quid pro quo*. *See United States v. Ford*, 435 F.3d 204, 213 (2d Cir. 2006) (explaining that "[b]roken into its essential pertinent parts," § 666(a) requires that "the

recipient must have accepted the thing of value while intending to be influenced") (internal quotation marks omitted). The jury also convicted Ridley-Thomas on five counts of honest services fraud, which specifically required the jury to find a *quid pro quo*. The jury's guilty verdict on the charge of honest services fraud confirms beyond a reasonable doubt that any error in the district court's instruction on this count resulted in no harm. *See United States v. Wilkes*, 662 F.3d 524, 544 (9th Cir. 2011); *see also Shen Zhen*, 115 F.4th at 1179 (noting that § 666 "does not require a jury to find a specific *quid pro quo*") (citation and alteration omitted).

### 4. "Lawful Ingratiation" Instruction

Ridley-Thomas asserts that the district court failed to instruct that goodwill gifts provided to a public official, including those given to curry favor or with the hope of future benefit, are not bribes under § 666, but rather, "lawful ingratiation." He maintains that an instruction was required to guide the jury in distinguishing between genuine corruption and an elected official responding to lawful lobbying efforts. We conclude that no such instruction was necessary on the facts of this case. *See Shen Zhen*, 115 F.4th at 1181 (characterizing a proposed instruction on "the difference between unlawful bribery and lawful ingratiation" as "unnecessary") (internal quotation marks omitted). Jurors were instructed that to find Ridley-Thomas guilty of federal program bribery, they must find that he "acted corruptly, that is, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of [Los Angeles] County." The Government's evidence established a sequence of events demonstrating Ridley-Thomas's intent to be influenced in connection with government business well before USC's

funneling services were used. Ridley-Thomas "was not entitled to further instruction on ingratiation that merely duplicated what the jury had already been told." *Id.* (citation, alteration, and internal quotation marks omitted).

In sum, we conclude that there was no instructional error by the district court for either honest services fraud or federal program bribery.

## D. Conspiracy

Ridley-Thomas's conspiracy conviction necessarily rises and falls with his convictions for honest services fraud and federal programs bribery. *See United States v. Gonzalez*, 906 F.3d 784, 790 (9th Cir. 2018) (concluding that for a conspiracy conviction, "reversal is required only if one of the objects of the conspiracy is *legally* deficient") (emphasis in the original). Ridley-Thomas contends that the conspiracy charge lacked a legally valid object, thereby rendering his convictions legally infirm. But because the honest services fraud and federal bribery convictions were predicated on legally valid objects, we affirm the related conspiracy conviction. *See id.*

## E. *Batson* Challenges

Ridley-Thomas contends that the Government violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by exercising its peremptory strikes to exclude the only two Black female jurors in the venire and offering pretextual justifications for its discriminatory intent. Generally, "we review the district court's ruling on a *Batson* challenge for clear error" but "review de novo whether the district court properly applied *Batson*." *Hernandez-Garcia*, 44 F.4th at 1163 (citations omitted).

Ridley-Thomas contends that a combination of race and gender improperly animated the Government's use of peremptory strikes on the two Black female prospective jurors. However, neither the Supreme Court nor this court has recognized a *Batson* claim based on intersectional considerations, a point that Ridley-Thomas concedes. *See Nguyen v. Frauenheim*, 45 F.4th 1094, 1099-1101 (9th Cir. 2022). We decline to do so today. To the extent that Ridley-Thomas's challenges are race-based, the district court did not clearly err. *See Hernandez-Garcia*, 44 F.4th at 1163. The Government used its first peremptory strike on a Black female prospective juror. Although "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose," *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019), "generally striking only one prospective juror who belongs to a protected group is not enough to draw an inference without other evidence." *Nguyen*, 45 F.4th at 1101 (citation omitted). The district court concluded that, at that point, the "totality of the circumstances" did not support an inference of discriminatory intent. *Id.*

## IV.   CONCLUSION

The service of funneling $100,000 from Ridley-Thomas to USC to United Ways for Sebastian's benefit was a "thing of value" sufficient to support Ridley-Thomas's convictions for both honest services fraud in violation of 18 U.S.C. § 1346 and federal program bribery in violation of § 666(a)(1)(B). The Government presented sufficient evidence of intent and materiality, and the district court did not err in its jury instructions for either honest services fraud or federal program bribery. Because we affirm Ridley-Thomas's convictions for honest services fraud and federal program bribery, we also affirm the conspiracy conviction. Finally, we decline to extend *Batson* to intersectional

challenges, and conclude that the district court did not clearly err in rejecting Ridley-Thomas's *Batson* challenges.

**AFFIRMED.**